**In the United States District Court for the**

**District of Columbia**

Adaeze Nwosu              \*
  1802 Vernon St            \*
  Washington, DC, USA 20009     \*
  *Plaintiff*                \*
                       \*

v.                        \*   CIVIL ACTION NO:

                       \*

1. Yale University d/b/a Yale School of Medicine   \*
   Office of General Counsel       \*
   55 Whitney Ave., 5th Floor     \*
   New Haven, 06510        \*
   Connecticut, United States     \*
                    \*

2. Laura Ment              \*
   Yale New Haven Children's Hospital   \*
   1 Park Street, Ste West Pavilion - 2nd Floor   \*
   New Haven, CT, 06504      \*
                    \*

3. Barbara Watts,          \*
   367 Cedar Street        \*
   New Haven, CT 06510      \*
                    \*

4. The United States Department of Education   \*
   Office of General Counsel       \*
   400 Maryland Avenue, SW,    \*
   suite 6e300              \*
   Washington, D.C. 20202-2110    \*
                    \*

5. Jillian Siegelbaum       \*
   400 Maryland Avenue, SW,    \*
   suite 6e300              \*
   Washington, D.C. 20202-2110    \*
                    \*

6. Meighan McCrea        \*
   400 Maryland Avenue, SW,    \*
   suite 6e300              \*
   Washington, D.C. 20202-2110    \*
                    \*

7. Gilian Thompson        \*
   400 Maryland Avenue, SW,    \*
                    \*

suite 6e300
Washington, D.C. 20202-2110

8.  Barbara Barzansky
    Liaison Committee for Medical Education
    Secretariat
    655 K Street NW
    Suite 100
    Washington, DC 20001-2399

9.  Robert B. Hash
    Assistant LCME Secretary and Associate
    Director, Undergraduate Medical Education
    655 K Street NW
    Suite 100
    Washington, DC 20001-2399

10. Kenneth b. Simons
    LCME field Secretary
    655 K Street NW
    Suite 100
    Washington, DC 20001-2399

11. University of Miami d/b/a Leonard M. Miller
    School of Medicine
    Office of General Counsel
    1535 Levante Avenue
    2nd Floor
    Coral Gables, FL 33146
    Locator Code 2918

12. Richard S. Weisman,
    Office of General Counsel
    1535 Levante Avenue
    2nd Floor
    Coral Gables, FL 33146
    Locator Code 2918

*25 July 2024*

* * * * * * * * * * * * *

**Jury Trial Demanded**

**Complaint of Negligence, Fraud, Conspiracy to Defraud, Violation of Federal Title VI, Violation of the Federal Tort Claims Act**

**Background of Parties**

The plaintiff applied as a prospective medical student to the defendants, and suffered repeated bouts of negligence and title VI discrimination that prevented her from studying medicine in the U.S.A and enduring harm and racial trauma as a medical student in Ireland.

**Basis of Jurisdiction**

The plaintiff brings this complaint into the District Court for the Washington federal question jurisdiction under 28 USC 1331. Venue is appropriate as all defendants have significant minimum contacts in the District of Columbia, for example defendant 10's accrediting secretariat is within the D.C and thus D.C's long arm statute applies. The plaintiff also exhausted her administrative remedies to sue the federal government employees under the federal tort claims act.

*Timing*

The timeline for fraud is 10 years

1.  Ms Nwosu's claims against Yale include events that occurred in 2022 and in 2017, the events that occurred within 2022 statute of limitations and the 2017 actions were continuing in nature.

2.  All claims pertaining to title VI violations are brought within the 3-year statute of limitations including against the 11th and 12th defendant, crucially when Ms Nwosu found out and obtained evidence of the negligent conduct of the 11th and 12th defendant

3.  All other claims against the other defendants are within the general three-year statute of limitations for civil torts.

**Counts**

The plaintiff pleads the following counts against the following defendants:

1.  Count I – Fraud/Misrepresentation/Negligent Misrepresentation with Conspiracy to Cover Up

2.  Count II – Title VI discrimination

3. Count III– Constructive Fraud

4. Count IV – Negligence

## 1. Statement of Claim/ Plaintiff's Affidavit in Support

### 1.1 - Fraud/Misrepresentation/Negligent Misrepresentation with conspiracy against Defendants 1 – 3 & Count II Title VI discrimination against defendants 1- 3

The plaintiff pleads fraud, constructive fraud and attempt & conspiracy to defraud against the defendants 1 – 7, pursuant to US code 18 U.S. Code § 1346 Scheme or Artifice to Defraud and 18 U.S. Code § 1349 – Attempt & Conspiracy. In April 2022, the plaintiff was invited to complete an application to transfer into the Yale School of Medicine for the **Spring** of the incoming class of 2022, following an unfortunate history of racial abuse to the point of evidence of grade manipulation to undermine the plaintiff's academic achievements in the school and targeted racial hate as the sole black woman in a class of 84 students. However, after reading the details of the protest letter written by the plaintiff's mom, against the racial hate her daughter faced in medical school, defendants 1 to 3, conspired to bring the transfer application process to a halt for the plaintiff and abruptly testified they weren't taking any transfer students that year. The plaintiff filed an office of civil rights complaint against the first three defendants, citing a prima facie case of discrimination based on race, color and national origin in violation of Title VI anti-discrimination federal laws. The defendants stated there was no racial discrimination because they turned down all 30+ "transfer enquiries" and relegated their abrupt change in policies, which coincided the submission the plaintiff's mom protest letter against the racial prejudice, and effectively stopped the plaintiff's application from progressing, to mere "oversight." Incidentally, defendant's two's daughter went to Yale Medical School, and there was no "oversight" in her application process.

." The plaintiff also pleads fraud against defendants 1 -3 for the apparently pre-planned abruption of the plaintiff's application, because as the freedom of Information Act documents revealed, Dr Ment said she *only* let the plaintiff begin an application to transfer into Yale Medical School in 2022, following a zoom call with the plaintiff and the plaintiff's mother on April 5 2022, to placate the anxieties of the plaintiff and her mother concerning. Meaning, that her telling the plaintiff to send modules/curriculum of her current medical education, obtain letters of recommendation and prepare to be interviewed by the admissions committee. The plaintiff complied and obtained six letters of recommendations from six distinguished professors, researchers and physicians from top universities across the US, within 1 month, in

69  support of her application and transfer. In response, Yale callously, abruptly changed their
70  transfer policy, in a manner that selectively victimized and harmed the plaintiff, who had gone
71  so far down the application process, to a degree that did not harm other alleged transfer
72  applicants who had not gone as far. Notably, for this prima facie case, transfer admissions at
73  most medical schools, and at defendant 1, differed than general admissions, in that the unique
74  circumstance of the transfer applicant necessitating the considered uniquely, independent of
75  other transfer applicants, and not in comparison to other transfer applicants, as per general
76  admissions standards. Thus, Yale's cover up and/or argument that no students were admitted to
77  transfer, thus there could not have been any discrimination, is but a superficial chicanery of the
78  underlying motive and/or conspiracy, and intention to defraud.
79  The plaintiff also pleads a claim of constructive fraud against defendants 1 – 3 because in their
80  capacity as Dean and Director of Admissions, and as an institution that publishes public
81  relations statements against discrimination on the basis of race, they owe a duty of trust to the
82  plaintiff and other applicants that they won't let their implicit and explicit biases,
83  anthropological backgrounds involving the reality of a divided nation along racial lines,
84  influence their decisions as to who is qualified to study medicine, based on race or national
85  origin. The reality is that the defendants fail in this duty of having an admissions process that
86  is not prejudiced by racial differences. For example, the plaintiff's 2017 interview with a Yale
87  physician, Dr Singh for admission into Yale Medical School was marred explicitly with overt
88  tones of discrimination. This interview came right after the director of admissions, Barbara
89  Watts prepped the interviewees that defendant 1 did not discriminate on the basis of race.
90  Barbara organized another interview and instructed the plaintiff to not tell the interviewer that
91  she was reinterviewing because she had faced racial discrimination. The plaintiff, then, naively
92  *trusted and had confidence* in Barbara Watts, that such non-disclosure was in her best interest.
93  This compounds the plaintiff's complaint of constructive fraud against defendants 1 – 3
94  because there is a 1:1 confidential relationship based in trust, even if they did not set out to
95  defraud the plaintiff, their sequalae of actions, prejudicial thoughts, implicit and explicit, served
96  to manifest *repeatedly and explicitly,* in denying the plaintiff and admission through he general
97  admissions process in 2017 and through the transfer admissions process in 2022. In 2017, after
98  the botched interview, the harm was already done: the plaintiff was waitlisted indefinitely.
99  Notably, her lack of admission occurred in the context of the 2017/18 college admissions
100 bribery scandal, of which defendant 1 was found to be a part. Notably too, defendant 1 sent
101 repeated information to the applicant asking her to clarify her financial aids requirement. The

102   plaintiff's harm is obvious: she has lost years of her life, financial losses in having to start
103   medical school elsewhere and not being able to finish, to the amount of $250,000.00
104
105   **1.1.1 *Facts in Support of Count I against defendants 1 – 3 & Count II against defendants***
106   ***1 - 3***
107   1.  On April 5 2022,  the plaintiff has an Initial Zoom call with the Dean of Admissions ,
108       Director of Admissions with the plaintiff's mom to review the concerns of the plaintiff's
109       2018 Application and discuss transfer options.
110          i.  During the zoom call, the transfer policy is emailed to applicant by Dean
111              of Admissions as it was not online
112   2.  On April 5 2022 the plaintiff made a written request to formally transfer to Yale School
113       of Medicine to defendant 2. On the zoom call the transfer admissions process is outlined
114       as follows by the dean:
115   3.  April 7 2022 – Curriculum of Applicant's current institution submitted to the Dean of
116       Admissions. It is acknowledged by the Dean and sent to the Director of Admissions
117   4.  April 12 2022 – Applicant's mom sends letter to Director of admissions detailing race
118       based prejudice faced by applicant at current school
119   5.  April 7 – 29  2022– Applicant obtains 6 letters of recommendations from physicians
120       and scientists globally
121   6.  April 29 2022 – Applicant tries to obtain an application form but notices that the transfer
122       admission policy on Yale School of Medicine website changes so the new consideration
123       period is now June, instead of April.
124          i.  Applicant writes to Director of Admission requesting an application, but
125              the Director of Admission responds that they are waiting to hear if there
126              would be space
127   7.  May 4 2022- Dean of Admission confirms there will be no space for transfer applicants
128       into the Fall semester 2022
129   8.  May 4 2022 – Applicant writes to Dean about inconsistencies and reminds Dean the
130       policy was to matriculate into the Spring Semester, and the application was already
131       being considered and under way. The Dean does not respond
132   9.  May 23 2022 – Applicant formally complains to Chief Officer of Diversity and
133       Inclusion at Yale School of Medicine about possible admissions discrimination.
134       Applicant does not hear back

10. June 14 2022– Applicant reaches out to the LCME accreditation to explain the situation. LCME accreditation advises applicant to lodge a formal complaint with the Parent institution, Yale University and lodge a complaint with the LCME for review at the next meeting in October 2022.

11. The plaintiff purports This is a civil rights title VI discrimination complaint against defendants 1 -3. The case involves race-based discrimination (violation of title VI) towards a student transfer applicant by the office of medical school admissions. The applicant was seeking a transfer admission into the 2nd year clinical year class i.e. Spring Semester 2023. The plaintiff holds this is a **violation of title VI and fraud (constructive and actual fraud)** because

   1. Yale School of Medicine changed its transfer admissions policy, as the plaintiff's application was already underway, in a way that unfavorably prevented a black female applicant, who **had testified in confidence to defendants 1 -3, about the racial prejudice and actions precluding her from continuing her medical education,** *because* she relied on their word that they did not discriminate on the basis of race, national origin etc, from completing an ongoing transfer application and admissions process.

   2. The decision to abruptly end the plaintiff's transfer process is a race-based discrimination case because the applicant was stopped from continuing an application only after detailed letter indicating reasons for transfer was sent to the dean of admissions; the letter detailed acts of racially motivated prejudice which the applicant had endured at her current institution.

12. The transfer process, as stipulated by the transfer policy given to the plaintiff by defendant 2 on the zoom call involved:

   (1) Submission of a letter detailing the reason for transfer

   (2) obtaining recommendation letters,

   (3) review of curriculum,

   (4) review of application,

   (5) zoom or in – person interview with the admissions committee.

13. The consideration for transfer hinged upon the similarity of curricular between the institution one is transferring from, and the Yale school of Medicine.

14. The **Dean of Admissions, defendant 2 had <u>accepted that the applicant could be considered for a transfer application</u> because the curricular between both schools would be similar**. The Dean of admissions advised the applicant to then apply for consideration and prepare an application in order to go through the full admissions process.

15. Yet, after the required letter of exceptional circumstance had been sent, indicating the reason for a transfer inquiry, the applicant wasn't suddenly stopped from submitting a n application, and there was a shift in the transfer policy.

16. Initially in May 2022, the explanation given by the Dean of Admissions for truncating the admissions process was lack of space for transfer into the fall semester. Later following the defendant's 4 ( the OCR's investigation), defendant 2 would relegate the multiple sudden changes to policy to negligent "oversight."

17. The plaintiff pleads a claim for constructive fraud for the truncation of the admissions policy because Yale's truncation of the admissions process for this applicant was out of compliance with its pre – existing policy, <u>as well as the LCME Accreditation standards set by defendants 8-10</u> for US Medical Schools because

    (1) The LCME requires that admissions decisions to an applicant be given by an <u>admissions committee</u>, not a sole person – which is what befell the plaintiff: wherein the admissions decision was given by the Dean of Admissions alone.

    (2) The LCME requires that admissions policies are non – discriminatory to any applicants and fair.

18. Defendant's 1 transfer application consideration period was supposed to begin in the Early Spring (April) 2022, and be reviewed by Late Spring (June), by which time the availability of positions would be determined. As explained by the Dean for Admissions, defendant 2, the availability of spaces for transfer applicants wishing to transfer into the **clinical years in the Spring Semester the following year**, was determined by the number of MD-PhD students who would opt for a research year instead of continuing into the clinical years in the spring semester ensuing.

19. Crucially, the decision by PhD students should only occur in late Spring, not prior, after the application would have been reviewed. Thus, the defendant's 1-3 admissions decision on space availability was prematurely given in the early spring to the plaintiff, and further indicated **<u>no space for the fall semester instead of the Spring</u>**, as originally stipulated in the transfer admissions policy

201
202
203
204
205
206

20. The recent case exudes a repeating pattern of constructive and actual fraud and race based discrimination, wherein 2017, when the applicant initially applied to Yale , the plaintiff endured a very racist interview by one of the admissions team, re-interviewed and was subsequently waitlisted indefinitely by the Director of Admissions, defendant , in 2018; the same year in which the Yale Admissions Scandal broke out for bribery

**1.2 Fraud, Constructive Fraud and Negligence, with Conspiracy to Cover Up by defendants 1 - 7**

The plaintiff brings the claims of actual fraud, constructive fraud and negligence against defendants 1 – 7, the U.S Department of Education's Office of Civil Rights and the attorneys who worked on the plaintiff's case.

Following the failure of internal resolutions by defendant 1, despite the plaintiff's complaint, the plaintiff escalated the complaint externally to the Department of Education Office of Civil Rights. The OCR opened a claim on August 23rd 2022 agaisnt defendant 1.

What appeared to be a promising start to legitimate investigation into title VI violations against defendants 1 – 3, ultimately devolved into an artifice and pretense of an investigation, and callous statutory rights violations, relegated to discretion. For example, following the plaintiff's complaint in August 2023 to the office of general counsel, to exhaust her administrative remedies, prior to instituting a suit, Jill Siegelbaum testified in January that the plaintiff would not have a claim in court because their acts were discretionary in nature and thus protected by immunity.

The plaintiff refutes Jill's assertion because defendant 4 and its employees denied the plaintiff's **non-discretionary and statutory right to an appeal of their decision finding that defendant 1 did not discriminate against her based on title VI protected classes of race and/or national origin/ color /ethinicity.** They denied her this statutory right by **shelving indefintiely** the timely filed December 22nd 2022 appeal of defendant's 4-6's 21st December 2022 decision. Despite the plaintiff's follow up throughout the Spring of 2023 with defendant 4, the plaintiff's appeal did not move forward. In this case the legal axiom holds: justice delayed *is* justice denied; and a denial of an appeal statutory right through delay tactics, does not preempt defendants 4-6 from immunity. Immunity does not protect officials from torts involving statutory rights and constituitonal rights violations.

The plaintiff also asserts the claims of fraud, and constructive fraud against the defendants 4-6 because they **led the plaintiff on to believe** that the plaintiff's responses to defendant's 1 preliminary responses to the palintiff's allegations of title VI discrimination were shared with defendants 1 -3 after a meeting with defendant 7, Gilian on November 10 2022. Specifically, Gilian the attorney handling the case mentioned she received the plaintiff's feedback interrogatory document, which pierced the superficial cover up answer of Yale's oversight response and lack of discrimination because they did not permit any tranfers that year. On the

241 Teams call, which Gilian mentioned she could not record, she mentioned the feedback was very

242 helpful       and       would       definitely       relay       that       to       Yale.

243 For clarity, the plaintiff understood the purpose of the call was to give the plaintiff an

244 opportunity to respond to Yale's comments about her allegations, which *would be subsequently*

245 *used* in their investigation. From Gilian's welcoming attitude of the feedback, and the mention

246 that she would relay that wil Yale, the plaintiff *fully expected* that defendant's 4 -6 would relay

247 her feedback to Yale's repsonses to defendant 1 -3, as the plaintiff understood to be the intention

248 of the call.

249 On November 14 2022, Defendant 7 testified that they would consider the plaintiff's responses

250 , but in their final decision on December 21st 2022, and through discovery by the Freedom of

251 Information Act, it became evident that not only was this supplemental information never

252 considered in their final decision, it also was never relayed to Yale for a response.

253 At no time did Gilian mention to the plaintiff that they would not send this additional questions

254 to Yale for an answer, even after the plaintiff asked on November 21 2022. Gilian simply

255 evaded / omitted to state that she had no intention of relaying that information to Yale as agreed,

256 or that she would not relay that information to Yale (see screenshots of email correspondences

257 below showing the ommision.

258



259
260
261
262



263
264 The plaintiff pleads thus fraud because "fraud entails a false representation of a material fact"
265 as well as an omission of a material fact or "fraud by nondisclosure." Fort Lincoln Civic Ass'n,
266 Inc. v. Fort Lincoln New Town Corp., 944 A.2d 1055, 1074 n. 22 (D.C.2008) (citing Bennett
267 v. Kiggins, 377 A.2d 57, 59-60 (D.C.1977)). The plaintiff also pleads constructive fraud, in the
268 event the omission was made innocently. See also Nguyen v. Voorthuis Opticians, Inc., 478
269 F.Supp.2d 56, 64 (D.D.C.2007) The point of fraud by nondisclosure is that Plaintiff claims to
270 have relied upon what the Defendant did not say:" in this case that the defendants 4 – 6 had no
271 intention of following up with Yale about the plaintiff's secondary questions to their superficial
272 oversight excuse inter alia. See. Witherspoon v. Philip Morris Inc., 964 F. Supp. 455 - Dist.
273 Court, Dist. of Columbia 1997. As you can see in the plaintiff's email to Gilian, defendant 7,
274 on November 21 2022, the plaintiff specifically asked for defendant's 1 response to her
275 subsequent enquiries, and on November 28 2022, when Gilian had an opportunity to state she
276 would not be sharing that information with Yale, she did not. In fact, the plaintiff reasonably
277 inferred that the information in her November 2011 email had been relayed to defendant 1, by
278 stating "we are considering the information that you and the University have provided in
279 connection with this investigation," which includes the subsequent information the plaintiff
280 sent. This is fraud by nondisclosure and/or negligent misrepresentation.

281 As the FOIA of the investigation revealed, the plaintiff's secondary feedback information was
282 never shared with Yale, and just 1 month later, the case was dismissed. The plaintiff has suffered
283 by this negligent acts of defendant 4 – 6 because the information / secondary questions to Yale
284 was essential to proving a prima fascie case of discrimination.

285 On Decemeber 2022 the plaintiff subsequently put those questions in the appeal document, and
286 the appeal, was unconstitutionally shelved indefineitely in Denver, and justice was effectively
287 denied.

288 The plaintiff also pleads conspiracy to defraud among defendants 1 – 7 and stall/squash the
289 plainiff's appeal and fair investigation with the OCR in the first instance, because all along,
290 during the investigation, the OCR Boston's voicemail was operated by the first defendant
291 and/or an affiliate of the first defendant, and this was stated clearly on the OCR's Boston's
292 voicemail. When the plaintiff brought this obstruction of justice and denial of a fair hearing to
293 the attention of the Justice Department in February 2023, a yale graduate, Ms Shaheena
294 Simons, head of the Educational Opportunities Section in the Department of Justice, seemingly
295 did nothing but refer the plaintiff's case back to the OCR. Yet when the plaintiff called the
296 phone line about two weeks later, Yale was no longer mentioned on the voicemail of the
297 voicemail box of the OCR Boston, and instructions to state information if you were a Yale
298 employee was removed.

299 Defendant's 1 invovlvement with the OCR, Department of Justice to the point of conrolling/
300 owning/ managing/operating and/or in any way being connected to and/or interferring with the
301 federal government
302 s ability to conduct an independent investigation is fraud, conspiracy to defraud and an
303 obstruction of justice as it deprives complainants of a fair investigation.
304 Thus, the plaintiff pleads that the entire OCR investigation launched in August 2022, concluded
305 in December 2022 and on appeal, is in partm but a fraudulent chicanery and conspiracy to
306 supress discrimination claims and violations of title VI federal statutes.
307

308   The plaintiff also pleads negligence against defendants 4 – 7, because although they were aware
309   of the timeline for matriculation in the Spring Semester of 2023 at Yale School of Medicine,
310   they did not *actually* begin to investigate with Yale until October 2022, almost three months
311   after investigation was opened. The plaintiff was diligent in following up and reminding
312   defendant 7 of the deadline and how an unduly delayed case, notwithstanding case load, would
313   adversely preclude her from enrolling in the Spring Semester at defendant 1 in 2023. Thus,
314   delaying the plaintiff's case until the last minute can only but be construed as a negligent way
315   to handle the investigation, because they were aware of the deadlines, were reminded by the
316   plaintiff, and though they informed the plaintiff they were investigating the case, the FOIA
317   focuments revealed that it wasn't until November that Yale responded. Thus, no timelines for
318   responses were enforced, as is the norm in such proceedings, to move the case along. This
319   neglgence is akin to a surgeon knowing his patient has a brain tumor and his patient's chances
320   of regaining full brain function reduces as time passes without surgery, yet negligently the
321   surgeon schedules his brain tumor patient last instead of triaging and priortizing case load
322   effectively, and consequently the person fails to regain full brain function.

### 1.3 Fraudulent Misrepresentation and Negligent Misrepresentation Claims against defendants 8 - 10

327   Defendants 8 – 10 hold significant positions in setting and upholding the accreditation
328   standards of medical schools, including defendant 1.
329   On 19, 20 and 21 September 2022, in line with their complaints process, the plaintiff brought
330   to the accrediting body the LCME, the alleged violations of the admissions process, inter alia
331   by defendant 1. According to Appendix D of its complaints process:

332   *"The LCME will consider complaints, information from credible and verifiable public media (i.e.,*
333   *print or online newspaper articles), and third-party comments about program quality (hereinafter,*
334   *"Complaints or Comments"), which, if substantiated, may <u>constitute noncompliance</u> with <u>one or more</u>*
335   *<u>accreditation standards and/or unsatisfactory performance in one or more accreditation elements</u>.*
336   *The LCME will not intervene on behalf of an individual complainant regarding, for example, matters*
337   *of admission, appointment, promotion, or dismissal of faculty or students."*

338   Notably, the plaintiff filed the complaint with the LCME on 19 September 2022 alleging that
339   defendant 1 had *"<u>one or more accreditation standards and/or unsatisfactory performance in one or</u>*
340   *<u>more accreditation elements,</u>*

341   Specifically, the plaintiff pled in her letter to the LCME:

342   *"I respectfully bring this complaint about breaches of the LCME accreditation standards by*

343   *Yale School of Medicine (YSM), where the Dean and Director of Admissions' actions*

344   *effectively violated multiple standards of the LCME accreditation and were inherently*

345   *discriminatory. My intention in bringing forth this complaint is for the Yale School of*

346   *Medicine to be compliant with the LCME accreditation standards and provide appropriate*

347   *remedies for its contraventions.*

348   *THE BREACHED STANDARDS AND ELEMENTS OF THE LCME ARE SET FORTH*

349   *BELOW:*

350   *A. Standard 3: Academic and Learning Environments*

351   *Element 3.4: The Yale School of Medicine has not followed its Anti-Discrimination*

352   *Policy.*

353   *While Yale School of Medicine has a policy in place to ensure that it does not*

354   *discriminate on the basis of gender identity, national origin, race, religion,*

355   *sexual orientation, or any basis protected by federal law, the policy is not*

356   *effective, i.e. in practice, the Dean and Director of Admissions, though being*

357   *educated on the policy, have deliberately acted against this policy.*

358   *• The Yale School of Medicine's Director and Dean of Admissions prevented*

359   *the progress of a Transfer application that was already underway on the*

360   *grounds of race. While the Dean of Admissions cited space availability as the*

361   *reason for stopping the application prematurely, the excuse was ultimately*

362   *inconsistent with the Transfer policy and prior information provided by both*

363   *the Dean and Director of Admissions. This discrimination claim is supported*

364   *because it was only after they received a letter detailing the race based*

365   *exceptional circumstances surrounding my transfer enquiry, that my*

366   *application was halted.*

367   *• Moreover, I was the only applicant who requested a transfer this cycle, so*

368   *the changes to the transfer admissions policy affected only me and was thus*

369   *inherently discriminatory and exclusionary.*

370   *Element 3.3: The Yale School of Medicine does not effectively implement Diversity*

371   *Programs and Partnerships to recruit and retain diverse medical students*

372   *• While the Yale School of Medicine has a Diversity, Inclusion Community and*

373   *Equity Office (DICE), the Dean of this office failed to address the complaint*

16

374   *of apparent discriminatory admissions practices. The Dean never*
375   *acknowledged receipt of my written complaint until one month later, after I*
376   *had contacted the LCME and the LCME advised I contact the parent*
377   *university. After I made a complaint to a staff member from Yale University's*
378   *Office of Inclusion, Equity and Accessibility (OIEA), the staff then wrote to the*
379   *Dean of Diversity at YSM. It was only then she finally wrote to me*
380   *acknowledging my complaint. However, she immediately referred the*
381   *complaint back to Yale's OIEA without addressing it. Unfortunately, the OIEA*
382   *attempted to address the complaint but failed, so it was escalated externally*
383   *and is now under investigation by the Department of Education. Thus, there is no effective*
384   *policy to practically deal with apparent race-based*
385   *discrimination issues within the school of medicine.*
386   *B. Standard 10: Medical Student Selection, Assignment, and Progress*
387   *Element 10.3: The Yale School of Medicine did not adhere to LCME policies regarding*
388   *Student Selection / Progress and Their Dissemination*
389   *• The Yale School of Medicine did not make the pre-existing transfer policy*
390   *available on their website or publicly. This policy was only provided to me*
391   *upon request during preliminary zoom call with the Dean and Director of*
392   *Admissions. They seemed to be unaware that it was not online.*
393   *• According to the Yale School of Medicine transfer admissions policy: the*
394   *preliminary consideration for transfer applications was based on space.*
395   *Ultimate eligibility for transfer was contingent upon comparability of*
396   *curricula between the student's current medical institution and Yale's. The*
397   *Dean provisionally determined comparability of my curriculum with YSM,*
398   *and there was no mention of space being a barrier. My transfer application*
399   *was permitted for consideration and curriculum documents were sent to the*
400   *Dean of Curriculum for formal review.*
401   *• While my application was underway, the Yale School of Medicine issued a*
402   *new transfer policy on their website, where they changed the time window*
403   *to consider transfer applications and erroneously halted my application*
404   *based on an excuse that was inconsistent with their pre-existing policy.*
405   *• The Yale School of Medicine did not identify who last reviewed and*
406   *approved the new transfer admissions policy that was imposed on me and*
407   *prevented my application from continuing.*

408      • *These new policy changes were not made available to all interested parties,*
409      *including myself as an applicant as it was at the time of submission that I was*
410      *informed I could no longer submit and/or continue my application.*
411      *Element 10.2, 10.7: The Yale School of Medicine did not use an admissions*
412      *Committee to act as a Final Authority on my Application Decision*
413      • *According to the pre-existing transfer policy, the next step in the process*
414      *would have been an interview and the review of my recommendation letters*
415      *by the Admissions Executive Committee. However, I was never interviewed,*
416      *and my letters of recommendation were never reviewed by an Admissions*
417      *Executive Committee.*
418      • *Although the Dean of Admissions advised my application would be reviewed*
419      *by a committee, I never was contacted by a committee or ever knew who the*
420      *committee consisted of. Although the LCME requires that the final*
421      *responsibility for accepting students to a medical school rest with a formally*
422      *constituted admission committee, the final decision to abruptly halt my*
423      *application came from only the Dean of Admissions.*

424 In response to the plaintiff's complaint, defendant's 9 and 10 wrote the very next day on
425 September 23rd that:

426      " *The LCME Secretariat reviewed the following material submitted on September 20, 2022*
427      *and September 21, 2022 as part of your complaint:*

428      • *Letter to LCME.pdf*
429      • *Formal Complaint for DICE Yale.pdf*
430      • *Gmail – Transfer correspondence Updated.pdf*
431      • *Request for Transfer into Yale School of Medicine.pdf*
432      • *Signed LCME consent form.pdf*
433      • *YSM Transfer Policy 01-14-22_431886_35659_v2.pdf*

434      *The LCME Secretariat has determined that the* **complaint does not contain issues relating to**
435      **the program's compliance with accreditation standards nor performance in accreditation**
436      **elements.** *For this reason, the LCME Secretariat has determined that the file on this*
437      *complaint is closed and no further action will be taken by the LCME.* "

438  Obviously the statements by defendants 9 and 10 stating that *"complaint does not contain*
439  *issues relating to the program's compliance with accreditation standards nor performance*
440  *in accreditation elements,"* is a lie/misrepresentation of the truth and/or a misrepresentation of
441  plain fact, wherein the plaintiff's letter poignantly identified the breaches in defendant 1's
442  compliance with accreditation standards no performance in accreditation elements, in her letter
443  to the LCME dated 19 Septmeber 2022 with supporting exhibits ensuing. Thus the plaintiff
444  alleges fraud and constructive fraud against defendants 8 and 9; the latter because they have a
445  direct duty of trust to her to uphold fairness and standards, to complainants who come to them
446  in confidence, in their underlined advertised, capacity as the body to accredit medical institutions training
447  a profession that is an emblem of decency, honesty, and virtuous self-sacrifice.

448  Even after the untimely and unjust dismissal of the plaintiff's legitimate complaint to the
449  LCME's subordinates, the plaintiff wrote to defendant 8, Barbara, the director for the LCME
450  on 27th September 2022, in a letter for reconsideration, specifically calling on her and her
451  LCME colleagues to practice what they preach on the Role of Accreditation in Achieving
452  Medical School Diversity (see supporting exhibit) ?:

453  *"In fact, your December 2021 article titled "What Is the Role of Accreditation in Achieving*
454  *Medical School Diversity?" you acknowledge the LCME has a pivotal role in ensuring*
455  *medical schools' policies are effective. Thus, it certainly should be of concern to your office*
456  *that the US Justice Department, the US Department of Education's Office of Civil Rights, and*
457  *attorneys have collectively deemed this case worthy of an investigation at a minimum, while*
458  *the LCME does not. This discrepancy should serve as compelling motivation to create more*
459  *robust and effective standards for diversity and anti-discrimination policies, with practical*
460  *evaluation measures to ensure school's standards are improving annually. It is important*
461  *that anti-discrimination policies, diversity outreach programs and diversity offices within*
462  *medical institutions are not mere façades to superficially satisfy a checklist requirement,*
463  *while entrenched personal belief systems opposing the progression of such policies remain*
464  *unchecked."*

465  Ms Nwosu thus sues her for negligence in knowing about the unjust, fraudulent and untimely
466  dismissal of the plaintiff's 19 September 2022 by her colleagues, and doing nothing about it,
467  even though she had a duty to ensure compliance with the accreditation standards. Ultimately,
468  the plaintiff alleges that it did nothing in ensuring compliance with Yale.

469  For clarity The plaintiff never asked for the LCME to ensure the plaintiff is accepted into
470  defendant's 1 school, but to perform their duty to her to ensure that pathways for a fair and
471  compliant admissions process are not obfuscated and obstructed, as they were.  As a result of
472  their negligence and nonchalance to enforce the accreditation standards they set, the plaintiff
473  could not hold defendants 1 -3 accountable as they were wantonly changing their transfer
474  policies in a manner that ultimately truncated her application that was already given the green
475  light to proceed, and as a result the applicant could not have a fair accredited admissions
476  process, and was unjustly denied admissions as a transfer student.

477  ### 1.4 Negligence against Defendants 11 and 12

478  *Why should rain fall only when it's over my head?*

479  The plaintiff brings claims of negligence against defendants 11 and 12 during the 2020
480  admissions cycle, when she had applied for the MD/MPH program. The plaintiff only found
481  out about the negligent act and the injury it caused her in Spring 2022, when the Dean of
482  Admissions, defendant 12, admitted in writing that had they not carelessly dropped her off the
483  waitlist, unbeknownst to her, and **not carelessly omitted** important information, she would
484  have been admitted into the MD/MPH program and be able to switch to the MD program. In
485  black is the writing from the 12th defendant on/around March 22nd 2022.

486  With regards to jurisdiction thus on negligence torts, the date a reasonable person becomes
487  informed of the injury / damage as a result of negligence, is the date from which to count statute
488  of limitations. Statutes of limitations for civil torts can be extended based on time of actual
489  discovery and/or at the time at which the cause of action must be concluded to have accrued.
490  Holifield v. Setco Industries, Inc., 42 Wis. 2d 750, 759, 168 N.W.2d 177, 182 (1969). Thus this
491  case is well within its statue of limitations

492

1 *"The records show that you were never placed on the alternate list for the MD program and should not have received a letter or email stating you were on the MD alternate list. Please provide a copy of that letter if you have it. Our records do not show such a letter was sent to you. My apologies if you did receive an alternate list letter for the MD program."*

I did receive an email confirming I was on the waitlist on 28 February.

2 *"You would have been removed by the Admissions Office staff from the MD/MPH program alternate list when your email request was received. As I recall, it was my decision to put you back and leave you on the alternate list for the MD/MPH program even after you requested to be withdrawn. I believe you would NOT have withdrawn from the MD/MPH program if you had known that your MD program score was lower and out of the alternate list range. If we had reached your score on the MD/MPH program alternate list we could have accepted you into the MD/MPH program and then switched you to the MD program if it were your preference."*

Sir, You removed me, not the Admissions Office. The Admissions Office subsequently put me on a waitlist, after you had removed me on 28th February. I acknowledged this waitlist confirmation on March 2 2020. After which there was no communication to state otherwise or indicate I was not on any waitlist, or rejected. I am attaching the email chain once again, this time highlighting the relevant portions of the timeline for your review. You did reach my score on the MD/MPH program alternate list, as per your last email, so why was I not accepted?

3 *"The Spring of 2020 was a particularly challenging time for us with the COVID pandemic. Overnight the Admissions Office was closed and the Office staff had to secure the equipment to work remotely. We were not at our best and a well-oiled machine was now working from our homes with limited access to all of our resources and no teamwork."*

493

494 The plaintiff also pleads the claim of negligence against the 11th and 12th defendant because

495 after her medical school interview in 2020, with psychiatrist physician, she spoke up to the

496 Miami staff "Chaperone" explaining her uneasiness about the type, tone and agressive manner

497 in which she was confronted not *interviewed* by the white phsyician. The Miam staff ignored

498 Ms Nwosu's legitimate concerns. Unfortunately, those concerns would prove legitimate as that

499 white physician gave the plaintiff one of the lowest scores post interview, as the March 2022

500 email trail revelaed, just enough to make her miss even being placed on the alternate list for

501 the MD program, as defendant 12 attested.

502 The plaintiff also pleads Title VI violations against defendants 11 and 12, the not in the explicit

503 sense of no black student being accepeted on the basis of race, compared to other non-black

504 applicants but that they violated title VI protections of race implicitly, as a corollary of

505 negligence, i.e. that it negligently removed the plaintiff from the waitlist because of her race /

506 national origin, i.e that to defendant 11 and 12, her candidacy was not important enough to

507 uphold their duty of care vis a vis other candidates in ensuring she gets placed on the waitlist,

508 after voicing her preferences. The plaintiff moves the burden to defendants 11 and 12 to show

509 that they have callously dropped other non-black students off waiting lists, or failed in similar

510 duties to uphold the same standard of care irrespective of race/national origin, especially in the

511 2020    admissions    cycle,    where    COVID    was    used    as    an    excuse    for

512 negligence/nonchalance/oversight.

513 Defendant 12 attempted to cover his negligence by falling back on defendant's 11 systemic

514 failure to erase implicit bias, under the guise of an objective interviewing process and cites that

515 her scores were low, indeed

516   The plaintiff also pleads negligence against defendants 1,2,3 9 and 10-12 for not screening their
517   interviewing physicians thoroughly and vetting for race based implicit bias that is only natural
518   for white people who were raised in America's racially divided 60s and whose parents more
519   than *likely* believed, if not taught, that black people were inferior to whites and less deserving
520   of certain roles , benefits and evidently deprived black people of such. It is not enough to
521   disprove negligence based on the fact that  defendants 1 and 11  have diversity and equity
522   offices or as defendant 12 asserted  in his email to the plaintiff in March 2022, his assistant
523   dean is black so there cannot discriminate. Such offices do not take away the hidden prejudice
524   that lays within an individual who has the power to covertly and systemically discriminate
525   against an applicant on the basis of race, by making an interview uncomfortable or unduly
526   onerous and then justifying it with a low score.
527   Because these sort of human factor biases can surface at any time, hence why racism is a public
528   health concern in America, the defendants have a duty  to applicants of ensuring their
529   admissions processes are stripped of human factor bias and prejudice, beyond public relations
530   statements of zero tolerance for discrimination. The plaintiff pleads it is negligent, knowing
531   human factor biases are real, yet   fail ensure such recourses for students, interviewees and
532   applicants are available, understood and accesible, given the power dynamic of the interviewer
533   and interviewee, especially when such students like the plaintiffs are trying to leave a positive
534   impression  and don't know if they can speak up, and even if they do whether they would be
535   dismissed as is the plaintiff's interaction with the defendants. To plead the claim of negligence,
536   a duty of care must be established, a breach of duty and damages to the complainant arise from
537   a breach of that duty.
538
539   **Relief**
540   Wherefore as a result of the transgressions against the plaintiff, that caused the plaintiff an
541   opportunity to study medicine in the USA, the plaintiff seeks to recoup her expenses, lossess
542   future earnings, punitive treble damages for the torts etc in excess of $600 million dollars.
543   The plaintiff also prays for general relief and court orders to reverse the obstructions to her
544   medical career imposed by the defendants.
545   Respectfully Submitted,
546
547   Adaeze Nwosu, In Pro Per,
548   July 26 2024
549

550
551
552
553

Certificate of Service

I certify I served a foregoing copy of the complaint against the aforementioned defendants on the listed addresses the 26 July 2024, via certified priority mail.

1. Yale University d/b/a Yale School of Medicine
   Office of General Counsel
   55 Whitney Ave., 5th Floor
   New Haven, 06510
   Connecticut, United States

2. Laura Ment
   Yale New Haven Children's Hospital
   1 Park Street, Ste West Pavilion - 2nd Floor
   New Haven, CT, 06504

3. Barbara Watts,
   367 Cedar Street
   New Haven, CT 06510

4. The United States Department of Education
   Office of General Counsel
   400 Maryland Avenue, SW,
   suite 6e300
   Washington, D.C. 20202-2110

5. Jillian Siegelbaum
   400 Maryland Avenue, SW,
   suite 6e300
   Washington, D.C. 20202-2110

6. Meighan McCrea
   400 Maryland Avenue, SW,
   suite 6e300
   Washington, D.C. 20202-2110

7. Gilian Thompson
   400 Maryland Avenue, SW,
   suite 6e300
   Washington, D.C. 20202-2110

8. Barbara Barzansky
   Liaison Committee for Medical Education Secretariat

655 K Street NW
Suite 100
Washington, DC 20001-2399

9.  Robert B. Hash
Assistant LCME Secretary and Associate Director, Undergraduate Medical Education
655 K Street NW
Suite 100
Washington, DC 20001-2399

10. Kenneth b. Simons
LCME field Secretary
655 K Street NW
Suite 100
Washington, DC 20001-2399

11. University of Miami d/b/a Leonard M. Miller School of Medicine
Office of General Counsel
1535 Levante Avenue
2nd Floor
Coral Gables, FL 33146
Locator Code 2918

12. Richard S. Weisman,
Office of General Counsel
1535 Levante Avenue
2nd Floor
Coral Gables, FL 33146
Locator Code 2918

554
555
556

Adaeze Nwosu, In Pro Per,

July 26 2024

11802 Vernon Street, Suite 508

Washington DC 20009